## 26309. STEVENS v. STEVENS.

Undercofler, Justice. Curtis T. Stevens filed a complaint in the Superior Court of Fulton County against Mary Ann Stevens seeking specific performance of a contract for the sale of land. The record shows that Curtis T. Stevens had been negotiating with the defendant for the purchase of this land. The defendant testified that she had written her attorney about the sale of this property, that he telephoned her and told her he had received her letter, that he had "talked to them" and that Curtis Stevens did want the property. On April 9, 1964, the attorney for the defendant wrote a letter to the plaintiff's attorney which stated: "Re: Estate of J. Robert Stevens . . . I am authorized by Mrs. Stevens to agree to sell to the Stevens family all of her interest in the estate of J. Robert Stevens for $10,500 and we will give you a reasonable length of time in which to raise the money. I think the deed should be a limited warranty deed and believe that your firm should prepare it. We will affix the documentary stamps and will pay all taxes through 1963." A copy of this letter was forwarded to the defendant by her attorney. Curtis T. Stevens, a brother of J. Robert Stevens, on June 29, 1964, through his attorney tendered his check for $10,500 and a limited warranty deed to the defendant's attorney. The letter transmitting the check and the limited warranty deed stated: "The taxes and insurance on this property will be prorated as of the date of closing." The defendant's attorney forwarded the check and limited warranty deed to her for execution. On July 6, 1964, he advised the plaintiff's attorney by letter that his client had written him stating that she was leaving on vacation the day she received the deed and check and would leave them in her bank box. On September 15, 1964, the defendant informed her attorney that she "had changed her mind" about selling the property. The defendant did not plead the Statute of Frauds.

The jury returned a verdict for the plaintiff and a judgment was entered thereon. The defendant appeals. *Held:*

1. The appellant contends that the court erred in overruling the general demurrer to the petition which was treated as a motion

to dismiss under the Civil Practice Act.

"The Civil Practice Act of 1966 (Ga. L. 1966, p. 609; *Code Ann.* § 81A-108 (a)) has eliminated issue pleading and substituted notice pleading. See *Reynolds v. Reynolds,* 217 Ga. 234, 246 (3) (123 SE2d 115). '. . . [A] motion to dismiss for failure to state a claim should not be granted unless it appears to a certainty that the plaintiff would be entitled to no relief under any state of facts which could be proved in support of his claim. If, within the framework of the complaint, evidence may be introduced which will sustain a grant of relief to the plaintiff, the complaint is sufficient.' 2A Moore's Federal Practice, § 8.13, p. 1706." *Bourn v. Herring,* 225 Ga. 67 (3) (166 SE2d 89).

The complaint in this case was sufficient to withstand the appellant's motion to dismiss.

2. The appellant contends that the trial court erred in failing to grant her motion for nonsuit at the conclusion of the appellee's evidence.

The Civil Practice Act (Ga. L. 1966, pp. 609, 687; 1967, pp. 226, 242, 243, 246, 247, 249; *Code Ann.* § 81A-201) specifically repealed *Code* § 110-310 which provided when nonsuits could be granted. The Civil Practice Act also provides: "This Title shall apply to all special statutory proceedings except to the extent that specific rules of practice and procedure in conflict herewith are expressly prescribed by law, but, in any event, the provisions of this Title governing the sufficiency of pleadings; defenses; amendments; counterclaims; cross-claims; third-party practice; joinder of parties and causes; making parties; discovery and depositions; interpleader; intervention; evidence; motions; summary judgment; relief from judgments and the effect of judgments; shall apply to all such proceedings." Ga. L. 1966, pp. 609, 668; 1967, pp. 226, 241; 1968, pp. 1104, 1109 *(Code Ann.* § 81A-181).

The provision for the granting of nonsuits has been specifically repealed by the Civil Practice Act, and this contention is without merit.

3. (a) The appellant contends that her motion for directed verdict should have been granted because the offer to sell the property to "the Stevens family" was too indefinite as to parties. This

contention is without merit.

The letter transmitting the appellant's offer to the appellee's counsel stated that the appellant agreed to "sell to the Stevens family all of her interest in the estate of J. Robert Stevens." The words "Stevens family" as used in the offer necessarily means the family of J. Robert Stevens. The offer sufficiently described the parties. Furthermore, the appellant testified that she understood at the time the offer was made that it was not made to the Stevens family but to Curtis Stevens with whom she had been negotiating and to her the Stevens family meant Curtis Stevens. Curtis Stevens, the brother of J. Robert Stevens, accepted the appellant's offer. Since the words "Stevens family" are ambiguous, parol evidence could be introduced to show the intention of the parties.

(b) The appellant further contends that her motion for directed verdict should have been granted since the description of one tract of the property in the limited warranty deed is different from the description of that tract granted to her by the year's support proceeding. The evidence shows that the appellant was the sole heir at law of her husband who died intestate and that the year's support proceeding awarded to her certain property described as an undivided one-fourth interest in 87.75 acres of marsh and rush land. The evidence showed that her husband owned an undivided one-fourth interest in 160 acres of marsh and rush land. Her offer was to sell "all of her interest in the estate of J. Robert Stevens." Therefore, the appellant as sole heir at law of her husband could not refuse to sign the limited warranty deed because it contained a description covering an undivided one-fourth interest in 160 acres of marsh and rush land which he owned.

(c) The appellant further contends that her offer to sell all of her interest in the estate of her husband included the household furniture and provided that she would pay the 1963 taxes, and that the acceptance of the offer by the appellee and his tender to her of $10,500 did not purport to include the household furniture and it stated he would prorate the 1963 taxes. "Where a party to an option contract in the notice to exercise the option suggests a departure from the terms of a provision of the con-

tract made for his benefit, but later waives such provision in its entirety, the other party can not complain on the ground that the offer to exercise was not made in accordance with the terms of the option." *Redmond v. Sinclair Refining Co.,* 204 Ga. 699 (3) (51 SE2d 409).

The Civil Practice Act provides in part: "If there is no conflict in the evidence as to any material issue and the evidence introduced, with all reasonable deductions therefrom, shall demand a particular verdict, such verdict shall be directed." Ga. L. 1966, pp. 609, 656; 1967, pp. 226, 237, 246, 248 (*Code Ann.* § 81A 150 (a)); *Aldridge v. Dixie Fire &c. Co.,* 223 Ga. 130 (1) (153 SE2d 723); *Mason v. Carter,* 223 Ga. 2 (1) (153 SE2d 162).

The trial court did not err in overruling the motion for a directed verdict since the evidence did not demand a verdict for the appellant.

4. The record shows that during the trial of the case counsel stipulated that only two issues should be determined by the jury. These issues were: "(1) Did the defendant, Mrs. Mary Ann Stevens, offer to sell the interest she received from her husband's estate to the Stevens family for $10,500 on April 9, 1964? (2) Was this offer accepted on substantially the same terms as made within a reasonable time?" The trial court so instructed the jury and required them to return a special verdict on these issues. Counsel was given the opportunity to object to the charge out of the presence of the jury. There was no exception to the charge by the appellant. The jury answered each question affirmatively. The judgment was entered in accordance with the verdict. The appellant contends that these instructions are "contrary to the law and evidence presented and contrary to the laws of this State."

"A party cannot complain in this court of an instruction to the jury when his counsel at the trial specifically acquiesced in the giving of such instruction." *Irvin v. Oliver,* 223 Ga. 193 (2) (154 SE2d 217); *Greenway v. Sloan,* 211 Ga. 775 (2) (88 SE2d 366). See also *Code Ann.* § 81A-149 (Ga. L. 1966, pp. 609, 656; 1967, pp. 226, 236).

The evidence was sufficient to authorize the verdict of the jury on the issues presented to them and these contentions are without merit.

414

*Judgment affirmed. All the Justices concur, except Felton, J., who dissents.*

ARGUED FEBRUARY 9, 1971—DECIDED MARCH 18, 1971.

*Roland P. Smith,* for appellant.

*Alaimo & Taylor, Anthony A. Alaimo,* for appellee.

FELTON, Justice, dissenting. I am unable to concur in most of what is said in the opinion. I think that a verdict should have been directed for the defendant. There are several reasons why this conclusion is demanded under the evidence.

1. The action is based on the offer to sell allegedly made by the attorney at law of the defendant. There is no other basis. It is not alleged or proved that written authority was given by the defendant to her attorney to make the offer. There was no ratification of the offer by the defendant in writing. That written authority was lacking required no specific demurrer or plea of the Statute of Frauds but could be reached by general demurrer (before CPA) or motion for directed verdict after CPA. The Code section, now § 4-105, was reconstrued in *Byrd v. Piha,* 165 Ga. 397 (141 SE 48) and the contrary construction in *Brandon v. Pritchett,* 126 Ga. 286 (55 SE 241, 7 AC 1093), by less than a full bench, was disapproved. In the *Pritchett* case, Chief Justice Fish was absent and Justice Lumpkin and Justice Beck concurred dubitante. The Code section, under various numbers, was not a part of the Statute of Frauds and does not require a plea of the Statute of Frauds under CPA. The offer made by defendant's attorney was void and was no basis for claim for specific performance.

2. There was no meeting of the minds of defendant and plaintiff as to who were the "Stevens family." Defendant testified that she negotiated with the plaintiff. She did not say that to her the Stevens family was the plaintiff. The attorney who acted for the defendant in making the offer did not specify who the Stevens family was. The plaintiff testified that he and other members were the Stevens family and the other members had given him authority to act for them. These other members should have been named as parties plaintiff or the plaintiff should have alleged the transfer of their interests to the plaintiff for the defendant's protection.

I cannot reconcile the statements in the majority opinion. In one place it states: *"The words 'Stevens family' as used in the offer necessarily mean the family of J. Robert Stevens. The offer sufficiently described the parties. . . Since the words 'Stevens family' are ambiguous, parol evidence could be introduced to show the intention of the parties."* The defendant did not testify as to who the Stevens family were. She simply said that she negotiated with Curtis Stevens. The only person who testified who the Stevens family were, as concerned with this case, was the plaintiff and he did not confine it to himself, as the evidence plainly shows.

3. The statement in the offer of the property offered for sale is "all her interest in the estate of J. Robert Stevens," meaning defendant's interest. I submit that under the evidence both parties to this case meant that the property intended to be sold was that land which the defendant obtained from her husband's estate *as a year's support.* She obtained a judgment for the support on April 6, 1964, and the offer was made on April 9, 1964, when neither defendant nor her attorney knew or had any idea that the year's support *did not exhaust the deceased's estate.* The defendant was later discharged as administratrix of the estate and the petition alleges full administration with no mention of any other property's being dealt with.

4. The offer made by the plaintiff was not to buy the same property acquired, offered by the defendant. The variance lies in the one-fourth undivided interest acquired by the defendant in the year's support proceeding. We quote the description in the year's support first: "An undivided one-fourth (¼) interest in and to that certain tract or parcel of land situate, lying and being in Glynn County, Georgia, and on St. Simons Island therein, containing eighty-seven and seventy-five hundredths (87.75) acres, more or less, of marsh and rush land, which is described by courses and distances as follows: Beginning at a point on the east bank of the Frederica River where land now or formerly owned by Albert Fendig corners with lands formerly owned by Mrs. Rossie Stevens at the time of her death, and from said commencing point running north 78 degrees and 50 minutes east for a distance of 3,520 feet to an iron pipe; thence, proceeding north 34 degrees and 30 minutes west for a distance of 1,125 feet to an iron pipe; thence, pro-

ceeding in a generally northerly direction for a distance of 100 feet, very little more or less, to a certain 25.25 acre tract of land designated as "J. F. Stevens" according to the plat hereinafter referred to; thence, following the low water mark line of said tract in a generally northwesterly direction until the same intersects with the easterly bank of Frederica River; thence, following the low water mark on the east bank of Frederica River following its meanderings in a generally southerly direction to the point of commencement. The 87.75 acres of land herein described being the southerly portion of land delineated on a plat attached to a certain deed from Anne S. Parker, et al. to Elliott T. Stevens dated February 2, 1949, and recorded together with said deed in the Office of the Clerk of Glynn Superior Court in Book 6-L, folio 438, reference being had and made to said plat and to the record of same for all descriptive and other purposes."

The description of the tract involving the one-fourth (¼) undivided interest in the acceptance of the offer by plaintiff is as follows: "All of a one-fourth (¼) undivided interest in and to: All that certain lot, tract or parcel of land situate, lying and being on St. Simons Island, Glynn County, Georgia, at Frederica, containing 160 acres of land, more or less, and bounded as follows: On the north by other lands of the Stevens Estate; on the east by Gulley Hole Creek and lands of Albert Fendig; on the south by Frederica River and Dunbar Creek; and on the west by Frederica River; said tract containing mostly marsh land and approximately one (1) acre of high land." This was a deliberate effort to enlarge on the acreage in this tract whether the effort succeeded or not.

The defendant was not bound to accept the offer even if there was a valid, authorized contract because if she intended to offer for sale the year's support land the acceptance should have followed it precisely.

The description of the one-fourth (¼) undivided interest tract, in the year's support judgment, calls for 87.75 acres more or less, but the land is conveyed by *metes and bounds* which controls the acreage exactly so that the inclusion of the *more or less* provision means nothing. In the acceptance of the offer, the deed sent to the defendant for her signature, describes the one-fourth (¼) undivided interest as *160* acres, and describes the land conveyed as the

land *within the bounds of the lines of adjoining landowners, a description quite different from the year's support judgment description.* This latter description does not follow the year's support description and is not an acceptance of the offer which the acceptance purported to be. The evidence seeking to explain the difference between the offer and the acceptance is difficult to understand but if it means that a grantor could gratuitously enlarge the number of acres deeded over the number stated in the offer in order to give the grantee a better foundation for a claim against others on the theory of adverse possession under color of title, as the evidence indicates, the explanation and action on the part of the plaintiff is contrary to good conscience, whether the plan might be successful or not, and stands as a bar to the plaintiff's claim to "clean hands" as he approaches a court of equity for relief by a prayer for specific performance.

The following testimony of the plaintiff is revealing on the question of (1) the lack of evidence that there was more land owned by the defendant's deceased husband than was set aside to the defendant as a year's support, (2) the purpose of describing the undivided land as containing 160 acres, and (3) the question as to who constituted the "Stevens family." Testimony by plaintiff: "Q. Mr. Alaimo asked you about the year's support and the value of the property which was attached by the appraisers. I will hand you back this document which is identified as Plaintiff's Exhibit No. 6, and ask you if you can refresh your memory and tell whether or not that is the property that was set aside? A. Well, apparently it was all of the property of J. Robert Stevens that was set aside and this was all the property of J. Robert Stevens. *He owned only the two tracts and a one-fourth interest in the undivided tract.* Q. Now, in that year's support, does it set forth a one-fourth undivided interest in the marsh land? A. I haven't read this through, Mr. Smith. You are probably more familiar with it than I am. Q. If I may call your attention to Tract #1, I believe that this might— A. Tract #1, it says: 'An undivided one-fourth interest in and to that certain tract or parcel of land situate, lying and being in Glynn County, Georgia, and on St. Simon's Island therein, containing 87 & 75 one-hundredths acres, more or less, of marsh and rush land, which is described by courses and distances

as follows': Q. Yes, sir, unless it is particularly necessary, Mr. Stevens, unless you would like to read that entire description, I have no question regarding the balance of it. I asked him if he would like to look at that particular tract and tell me whether or not it sets forth 87.75 acres. A. It does set out 87.75 hundredths acres by the measures and compass readings, I would have to go to the plat to identify it. Q. Now, is there anything in the year's support, Mr. Stevens, that gives her any interest at all in 160 acres of marsh land? A. It says 87.75 hundredths acres more or less. There is nothing here that says 165 acres. Q. So you are saying that the more or less might expand it to 160 acres? A. Yes, sir, it could. Q. Mr. Stevens, do you own any other real property? A. Yes, sir. Q. How many other tracts or parcels do you own? Are you familiar with the terms used in deeds more or less? A. Well, yes, sir, but I am not enough familiar with that that I could just glance through it and be familiar with it, perhaps like a title lawyer could know. I could sit down with it for five minutes and tell you whether it is right or wrong. Q. But if somebody asked you to sign a deed for 87.75 acres of land, more or less, and somebody else contended that that parcel was really 160 acres, would you feel that that more or less covered that discrepancy? A. Well, Mr. Smith, the more or less in that case was due to the fact that a neighbor of ours, Mr. Albert Fendig, was claiming a portion of that marsh land and he brought a form of legal proceedings against us at which time Mrs. Mary Ann Stevens was advised that the proceedings were taking place, her being one of the owners. She did not respond to it and we fought the suit out and won it in our behalf. Q. And when was that suit brought? A. That took place in 1966. Q. So if you had had a deed conveying to you 160 acres of the marsh land, it would have strengthened your claim in this ensuing lawsuit? A. I don't think that it would materially have, no. We had a prior deed, Mr. Smith, from Christ Church, Frederica, dated 1851, in which my great-grandfather bought the entire tract of 300 acres and this piece of marsh land was a portion of it. Q. If that was so, why was not that portion of marsh set aside to Mrs. Stevens under the year's support? A. Mr. Smith, I did not set this aside. I think it was Mr. Adams that perhaps wrote this. Q. This all had reference, I believe, to certain deeds that were filed in the

Ordinary's office. That tract #1, I believe there, refers to a deed in the bottom paragraph if you would look to refresh your memory. A. Mr. Smith, there are deeds on St. Simon's where several people own the same property according to titles, and it is rather confusing about that. Q. And Mr. Fendig made claim to this marsh land at the time you were negotiating with Mrs.— A. Yes, sir. Q. Now, Mr. Stevens, at the time that your attorney, Mr. Sapp notified you that he had received from Mr. Ronald Adams a letter dated April 9th authorizing him to sell the Stevens family all the interest in the estate for $10,500, did you, or Mr. Sapp, in your behalf assent in any manner to this contract, did you accept it? A. Oh, yes, Mr. Adams was informed that we were proceeding immediately with the loan from the American National Bank. He was kept posted on the procedure of the loan. Q. Was this contract made contingent on you getting the loan? A. She gave us a reasonable length of time to raise the money. Q. Are you familiar with the contracts of sales, Mr. Stevens? A. No, sir, there again I haven't had any legal experience, Mr. Smith. Q. Outside of legal experience, have you bought and sold any property? A. Oh, one or two pieces, yes. Q. Have there been written contracts between you and the seller? . . . You did not refine any of these remarks made in Mr. Ronald Adams's letter at that time? A. I did not. Q. You did not refine them, you did not say the Stevens family is me? A. No. Q. You did not set forth that the estate of J. Robert Stevens, exactly about what you were contracting for? A. Mr. Smith, if you were dealing with a group of people, someone has to be a spokesman, and in this case, I was the spokesman. I was authorized to act for the Stevens family. Q. But you made no attempt other than these telephone conversations to go into any of the terms contained in this particular document right here? A. Well, Mr. Adams accepted the check and forwarded it on to Mrs. Stevens when he got it. Q. The contract was not with Mr. Adams, it was with Mrs. Stevens? A. I understand that, but he was her representative. I would not have had any reason, legally, to contact her. Q. Mr. Stevens, at the time that we recessed for lunch, it is my recollection that you testified that you were acting as spokesman for the Stevens family. Was this substantially your testimony? A. Yes, sir. Q. And this was for Ben, your brother and sister, and for your four

children? A. Yes, sir, it would have been; well, I don't know, any-thing that they got would have been inherited through me. So I think that what came to me would be by itself. I don't know that they had to come into it. Q. Now, when you say 'they had to come into it,' who do you mean, 'they'? A. My four children. They were all minor children. Q. Now, were Ben and Ann represented in this payment that you raised, did they put any money into that payment? A. Which payment are you talking about? Q. The money that you raised to buy the property, the $10,500? A. No. Q. Mr. Stevens, I hand you a document identified as Defendant's Exhibit No. 2, and ask you if that is a contract that was sent up for Mrs. Stevens's signature? A. Mr. Smith, I will have to tell you again that I presume that it is, but my lawyer handled all the legal procedure here, and as far as I know, this is what he made and sent up for her signature. Q. Did you discuss what should appear in the deed with your lawyer? A. Not particularly, but he knew that there was three tracts of land involved, yes. Q. Now, did you see the contract at the time you wrote the check and it was sent up? A. This contract? Q. Any contract. A. Well, I was pretty well kept informed of the transactions as they took place, but all the legal technicalities, I just simply leave to my lawyer, who I presume to be capable of handling them for me, Mr. Smith. Q. I wasn't asking about the legal technicalities. I just asked you if you saw the contract, any contract that was prepared by your lawyer at the time that you gave him the check for $10,500. A. Yes, yes, he had the contract and I presented him with the check at his suggestion made payable to Mr. Adams and to Mrs. Ste-vens. Q. All right, would you know of your own knowledge whether or not the deed that was prepared by your attorney and sent to Mr. Ronald Adams named you as the sole grantee of the property? A. I presume that it did, yes. Q. So in other words, you were going to take title to the property as spokesman for your brother and sister? A. Yes, sir. Q. But they were not to appear on the deed at all? A. No. Q. They didn't have any monetary interest in it at all? A. That's right. Q. Mr. Stevens, would it be fair to say that you only had a vague idea of the property that was to be conveyed to you by Mrs. Stevens? A. No, I knew what portion that Bob had inherited up there, and the agreement was made that

Mrs. Stevens would sell to me, or to the Stevens family, all of the real estate that Bob Stevens inherited. Now, it wasn't spelled out in that letter of commitment, if I might call it such, but it was Bob's intention all of his life as evidenced by his note and as evidenced by his comments to endless people that he wanted the property to stay in our family. Q. But you were not dealing with Bob now, you were dealing with Mrs. Mary Ann Stevens? A. That's right, yes. Q. And it was your understanding that the property that was to be conveyed was what she received from her husband's estate? A. That's right. Actually, I suppose a quitclaim deed would have been as satisfactory as anything else because it simply would have quitclaimed anything she inherited from the estate of John Robert Stevens. Q. Now, if you were acting as spokesman for your brother and sister, would you explain to the jury why only your name was on the deed? A. Well, they informed me to act for them. Yes, sir, Ben specifically wanted a small portion of the land next to his tract because when the property was divided, it came a little bit too close to the front of his house and he wanted to get a small corner of that to add to his lot, which, of course, was agreeable to me if I obtained the property."